UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MICHAEL MCDERMOTT,
        Petitioner,


        v.                                    CIVIL ACTION NO.
                                              09-11992-RGS


STEVE O'BRIEN, Superintendent,
        Respondent.


**REPORT AND RECOMMENDATION RE:
PETITION FOR WRIT OF HABEAS CORPUS
(DOCKET ENTRY # 1)**


**October 25, 2011**


**BOWLER, U.S.M.J.**

In November 2009, petitioner Michael McDermott
("petitioner"), an inmate at the Old Colony Correctional Center
("Old Colony") in Bridgewater, Massachusetts, filed a petition
for a writ of habeas corpus under 28 U.S.C. § 2254(d) ("section
2254").  (Docket Entry # 1).  The petition challenges his 2002
conviction for seven counts of first degree murder under theories
of deliberate premeditation and extreme atrocity or cruelty and
various weapons charges in the Massachusetts Superior Court
Department (Middlesex County) ("the trial court").

Respondent Steve O'Brien ("respondent"), Superintendent of
Old Colony, filed a memorandum in opposition to the petition.

(Docket Entry # 17).  Petitioner then filed a memorandum in reply to respondent's memorandum in opposition to the petition. (Docket Entry # 19).  The record is therefore ripe for review.

## GROUNDS FOR RELIEF

The petition attacks the conviction because:  (1) petitioner received ineffective assistance of counsel (ground one); and (2) the trial court denied petitioner funds to obtain an expert in support of his motion for new trial in violation of due process (ground two).  (Docket Entry # 1).  The ineffective assistance of trial counsel claim subdivides into complaints that trial counsel:  (a) did not investigate or present evidence that petitioner's conduct resulted from a drug induced state of auditory and visual hallucinations caused by his ingestion of a prescribed medication, Prozac; and (b) failed to request a jury instruction on involuntary intoxication.  (Docket Entry # 1).

## PROCEDURAL BACKGROUND

On February 15, 2001, a grand jury indicted petitioner for seven counts of first degree murder and five weapons charges.  On April 22, 2002, a jury found petitioner guilty of the five weapons charges and seven counts of first degree murder on theories of deliberate premeditation and extreme atrocity or cruelty.  The trial court sentenced petitioner to seven

consecutive life sentences to be served concurrently with two and one half years for the weapons charges.

Represented by new counsel ("appellate counsel"), petitioner appealed to the Massachusetts Supreme Judicial Court ("SJC"). Appellate counsel argued error in the denial of a motion to suppress evidence seized from petitioner's apartment and a motion for a mistrial as well as the instructions to the jury. On April 13, 2007, the SJC affirmed the judgments of the trial court. Commonwealth v. McDermott, 864 N.E.2d 471 (Mass. 2007). On July 17, 2007, petitioner filed a petition for writ of certiorari with the Supreme Court. The Court denied the petition on October 9, 2007. McDermott v. Massachusetts, 128 S.Ct. 257 (2007).

On September 29, 2008, petitioner filed a motion with the trial court for a new trial and request for funds to retain an expert. The trial court denied the motion on July 24, 2009.

On September 15, 2009, petitioner filed a petition pursuant to section 33E of Massachusetts General Laws chapter 278 ("section 33E") for leave to appeal the trial court's denial of petitioner's motion for new trial. The petition was denied on November 18, 2009.


HISTORICAL FACTS

The historical, basic or primary facts determined by a state court are presumed correct although a petitioner may rebut the

presumption by clear and convincing evidence.  28 U.S.C. §

2254(e)(1); <u>Coombs v. State of Maine</u>, 202 F.3d 14, 18 (1st Cir.

2000) (presumption applies to "'basic, primary, or historical

facts'" with respect to external events including "the

credibility of their narrators"); <u>accord</u> <u>Sleeper v. Spencer</u>, 510

F.3d 32, 38 (1st Cir. 2007) ("the term 'facts'" in section

2254(e)(1) "refers to 'basic, primary, or historical facts,' such

as witness credibility and recitals of external events").  The

presumption extends to the facts found by the suppression court

and the SJC. <u>See</u> <u>Teti v. Bender</u>, 507 F.3d 50, 58-59 (1st Cir.

2007) ("'presumption of correctness is equally applicable when a

state appellate court, as opposed to a state trial court, makes

the finding of fact'").  The historical facts found by the SJC

are as follows:

> The [petitioner] began working at Edgewater in
> February, 2000.  On December 14, 2000, he had a conversation
> with Cheryl Troy, who was in charge of the human resources
> department of Edgewater, and Patricia Bohrer, the company's
> chief financial officer, concerning an Internal Revenue
> Service (IRS) tax lien of approximately $ 5,500 that
> required Edgewater to garnish a large portion of the
> defendant's paycheck until the lien was fully paid.[1] The
> defendant claimed that he did not owe the IRS any money.  He
> was upset and angry, and indicated that he did not
> understand why Edgewater had to comply with the garnishment.
> Later that afternoon, Marc Damboorajian, the program manager
> in charge of the application support team that included the
> defendant, spoke with the defendant in an effort to help

---

[1]  At this point, the following footnote appears in the
opinion:  "The garnishment would have left the defendant with
$276.92 every two-week pay period, and would have lasted about
six weeks, or three payrolls."

resolve the tax lien.  On December 18, Damboorajian assisted
the defendant in a telephone conference with the IRS that
terminated when Damboorajian realized that nothing was going
to be resolved.  The defendant was not willing to establish
a payment plan, and insisted that he was not going to make
any payments to the IRS.

The defendant had other financial trouble.  He was
behind on his automobile payments, and on December 21, the
defendant received a telephone call informing him that his
automobile would be repossessed if he did not make his
payments.  The defendant began to park on the street,
approximately five minutes away from Edgewater, instead of
in the parking garage across the street from Edgewater where
employees received parking privileges (Edgewater garage).

On Friday, December 22, the defendant asked three of
his coworkers to come to his cubicle to witness the signing
of his will.  He "walked [them] through" the instructions,
and they witnessed his signature to the document and then
signed it themselves.  On Sunday, December 24, the defendant
test-fired a shotgun off the side of Crystal Street in a
secluded area of Haverhill, which was about a five-minute
drive from the defendant's residence.  On Monday, December
25, the defendant entered Edgewater at 6:57 P.M., and left
about eighteen minutes later.

On Tuesday, December 26, the defendant entered
Edgewater at 10:29 A.M., carrying a large, black duffel bag.
He had parked his automobile in the Edgewater garage.
Shortly after 10:30 A.M., the defendant went to the kitchen
and had a brief and friendly conversation with a senior
consultant at Edgewater.  The defendant also engaged in
conversation with another coworker about living in
Haverhill.  The defendant was jovial and cordial, but
abruptly ended the conversation when the coworker spotted
the large, black duffel bag on the defendant's desk.  At
approximately 11:07 A.M., the defendant received a telephone
call about his automobile.  He stated that he no longer
needed the automobile and it could be picked up at the
Edgewater garage.

After completing the telephone call, the defendant
entered the reception area, carrying the duffel bag.  Janice
Hagerty, a travel coordinator of Edgewater who was with Troy
in the reception area, asked the defendant where he was
going, and he responded, "Actually, I need to see someone in

human resources." The defendant aimed his assault rifle and fired twice, and then ten more times in rapid succession killing both Hagerty and Troy. The defendant stated softly, "Ah, it's okay."

In the accounting area in the south side of the building, Linda Tessier, who worked in the accounts payable department, heard loud noises coming from the north side of the building and called Hagerty in reception. Hagerty did not answer the telephone. Rose Manfredi, a payroll manager who had been processing the payroll that day,[2] was standing with Paul Marceau, a project leader, by a file cabinet in the accounting area. Manfredi asked Tessier to shut and lock the door, which Tessier did. Tessier told everyone to get under their desks. Marceau got under a desk in a coworker's cubicle. Tessier hid under her desk, moving her chair with her jacket draped over it into the desk.

Meanwhile, Jonathan Land, the vice president of consulting services, was standing with Louis Javelle, the director of consulting services and the [petitioner's] direct supervisor, in a hallway in the mezzanine area of the south side of the building, facing the reception area. The [petitioner] walked toward them, carrying an assault rifle in one hand and something else in his other hand. When the [petitioner] was approximately fifteen to twenty feet away from Land and Javelle, Javelle said, "Oh shit." Land went back to his office and heard Javelle ask, "Mike, why?," followed by a loud pop. The [petitioner] shot Javelle four times, killing him. Land then heard Craig Wood, a technical recruiter who had been sitting in his cubicle in the mezzanine area, say, "Mike, no." The [petitioner] shot Wood in two series of blasts, killing him. Between the series of blasts, Wood said, "Ow," and then, "Please." The [petitioner] proceeded to kill Jennifer Capobianco, a software programmer who had been seated at her cubicle in the mezzanine area, shooting her four times in the back.

The [petitioner] fired a shot through the lock on the door to the accounting area and entered. From under her

_____
    [2]    At this point, the following footnote appears in the opinion: "Manfredi was responsible for the biweekly payroll. She processed the payroll on the Tuesdays preceding the Friday payroll dates. The forthcoming payroll date of Friday, December 29, 2000, would have been the first one in which the defendant's salary would have been garnished."

desk, Tessier could see a weapon and legs walking by.  She
peeked out and saw the [petitioner], who was holding a rifle
in his right hand.  The [petitioner] stopped between the
cubicles that Marceau and Manfredi were under and raised his
left arm toward Marceau.  Tessier closed her eyes and heard
two shots.  After a third shot, Manfredi yelled, "Ow."  The
[petitioner] shot Manfredi multiple times.  Manfredi
screamed, and the [petitioner] shot her again.  Tessier
heard gurgling sounds coming from the direction of
Manfredi's cubicle.  Manfredi died within minutes.  The
[petitioner] shot Marceau in the head, abdomen, and chest,
killing him.

    At approximately 11:15 A.M., officers from the
Wakefield police department were dispatched to Edgewater in
response to several 911 telephone calls about shots being
fired.  Officers entered the building and found the
[petitioner] sitting in a chair in the reception area, erect
and motionless, with both arms on the arm rests.  The
[petitioner's] duffel bag was on a couch, and there was an
AK-47 semiautomatic assault rifle on the floor by the
[petitioner's] right foot and a twelve-gauge Winchester 1300
pump-action shotgun by his left foot.  These weapons were
out of ammunition.  The officers told the [petitioner] to
put his hands up and to get on the ground.  The [petitioner]
did not respond.  An officer directed the [petitioner] to
put his hands on his head, and the [petitioner] replied, "I
don't speak German."  Two officers then pulled the
[petitioner] to the ground and handcuffed him.  The officers
searched the [petitioner] and found a loaded .32 caliber
Spanish Retolaza semiautomatic pistol in his front right
pocket.  The [petitioner's] duffel bag contained several
fully loaded magazines, loose ammunition, shotgun shells,
and some cartridge boxes.

    The [petitioner] followed the officers' instructions to
roll over and stand up, to sit back down in the chair and
lift up his legs so that his boots could be removed and
searched, and to get into a police cruiser in a certain
manner to avoid injury due to his large size.  The officers
transported the [petitioner] to the police station where he
was booked.

    Seven people were pronounced dead at Edgewater and were
identified as Troy, Hagerty, Wood, Capobianco, Javelle,
Marceau, and Manfredi.  Each person's cause of death, with
the exception of Hagerty, was multiple gunshot wounds.

Hagerty died almost instantly from a single gunshot wound to her head, but had also been shot in the back. All of the victims had been alive when they were repeatedly shot.

Police recovered numerous discharged cartridge casings, numerous spent projectiles, several discharged twelve gauge shotgun shells, and numerous spent lead and copper projectile fragments from the reception, mezzanine, and accounting areas of Edgewater. In addition to the weapons recovered by the [petitioner's] feet and the one found on his person, police recovered a .460 magnum caliber Weatherby Mark V bolt-action rifle from the [petitioner]'s work station. The Commonwealth's expert ballistician explained that testing revealed that numerous spent projectiles recovered from Edgewater had been fired from the [petitioner's] AK-47 assault rifle, and that the discharged shotgun shells recovered from Edgewater and from Crystal Street had been fired from the [petitioner's] twelve-gauge pump-action shotgun.

Commonwealth v. McDermott, 864 N.E.2d at 475-477.

At this point, the SJC recited facts summarizing "the defense case." Id. at 477. This summary reads as follows:

[Petitioner] was born Michael Morgan Martinez, but later changed his surname to McDermott in 1980. His parents were strict Catholics. The [petitioner] reported having been repeatedly raped by a neighbor as a young boy. He grew up as a "geek." Although gifted with high intelligence, the [petitioner] received poor grades in high school and got into some trouble when he broke into a neighbor's house. He first attempted suicide as a teenager by taking numerous "Sleep Eze" pills. His parents sent him to a psychologist, who violated his trust by failing to maintain his confidences.

After graduating high school, the [petitioner] joined the Navy where he served for six years, working principally on a nuclear submarine. He was honorably discharged in June, 1982.

In 1982, the [petitioner] obtained employment at Maine Yankee, a nuclear power plant in Maine. He received a promotion in 1985. In February, 1987, the [petitioner]

attempted suicide by cutting his wrist.[3]  He was admitted to Pembroke Hospital.  He later filed a worker's compensation claim against Maine Yankee because he was not permitted to return to work.  The [petitioner] netted approximately $85,000 in a settlement of that claim.

The [petitioner] returned to Massachusetts, and, in September, 1989, began taking classes at Northeastern University.  In May, 1989, he was admitted to a Boston hospital for a few days because he was suicidal.

In July, 1990, the [petitioner] started working for Duracell Battery, and was employed there for a decade.  In the early 1990's, the [petitioner] attempted suicide by overdosing on Xanax.  He was admitted to Pembroke Hospital for seven weeks.  Sometime thereafter, he got married.  His wife left him in May, 1996, and they were divorced in August, 1997.  Instead of relocating with Duracell to Connecticut, the [petitioner] obtained employment at Edgewater as an associate software developer in February, 2000.  In the fall of 2000, the [petitioner] moved to Haverhill.

Commencing in his youth, and continuing into adulthood, the [petitioner] described a long-standing problem with depression.  Over the years, the [petitioner] experienced a variety of problems, including visual distortions, extreme claustrophobia, transgression into a "fugue state,"[4] a difficulty focusing on objects, muffled hearing and ringing in his ears, hearing voices from electronic devices, and auditory and visual hallucinations.  He kept most of these problems to himself because of his mistrust of psychiatrists and his fear of being locked up.  The [petitioner] claimed that, during his employ at Maine Yankee, he was subject to radiation exposure that "killed" his thyroid.  Throughout

_____

[3]  At this point, the following footnote appears in the opinion:  "A hospital record indicates the 'precipitant' for the defendant's suicide attempt 'was his feeling of helplessness in as much as he felt he was doing everything correctly [but] the world was not treating him fairly.'  Much of the defendant's stress was work related."

[4]  At this point, the following footnote appears in the opinion:  "A fugue state is a dissociative episode.  When a person comes out of the state, he or she has no memory of what occurred in the state."

his life, the [petitioner] took a variety of medications, including medication for a hypoactive thyroid, medication for high blood pressure, and, since moving to Haverhill, different antidepressants, such as Prozac and Trazodone. The [petitioner] admitted that, since the 1980's, he had been lying to doctors to obtain prescription medications.

The [petitioner] recounted that, for as long as he had access to the Internet, going back to 1985, he "wanted to understand what type of insanity [he] had" and conducted research on the computer. His research included Internet searches on how to fake mental illness, psychosis, and malingering, and he fully understood the data he retrieved on these subjects. In December, 1999, the [petitioner] purchased a book edited by Richard Rogers entitled Clinical Assessment of Malingering and Deception, which he claimed not to understand, and he later obtained an article over the Internet on the psychometric detection of malingering. The [petitioner] also downloaded an article entitled "Borderline Personality Disorders, Symptoms and Etiology," which he explained was an attempt at self-diagnosis. He studied and researched the Minnesota Multiphasic Personality Inventory (MMPI) test.

The [petitioner] testified that on December 14, 2000, after he learned about the IRS garnishment of his salary, an archangel appeared to him in his cubicle at work. The archangel said that God had a plan for him. Under the plan, the [petitioner] could obtain a soul[5] and go to purgatory (and possibly, in time, to heaven) if he went back in time and prevented the Holocaust by killing Hitler and six of the "architects of the Holocaust," who were Nazis wearing swastikas. The archangel indicated that the [petitioner] would act after the appearance of three signs.[6] The [petitioner] then started preparing for his completion of

---

[5]  At this point, the following footnote appears in the opinion:  "The defendant believes he was born without a soul."
[6]  At this point the following footnote appears in the opinion:  "The defendant explained that the first sign was the appearance of the archangel, the second sign was a celestial sign (that turned out to be a partial solar eclipse that occurred on Christmas day), and the third sign was the occurrence of Boxing Day.  On December 26, 2000, at about 10:37 A.M., the defendant's mother called him at work and wished him a happy Saint Stephen's Day, adding, "or would you rather Boxing Day.""

God's plan.

The [petitioner] reasoned he could not "leave" himself to the Nazis after killing Hitler and the six Nazis.[7] However, because suicide constitutes a sin that condemns one to hell, the [petitioner] concocted a scheme where he would die without sin. The [petitioner] planned to take poison before the killings, and then succumb to death afterward. This plan would ensure the [petitioner] a place in purgatory.

The [petitioner] decided what weapons he would use, and on December 24, test-fired his AK-47 assault rifle and his shotgun.[8] On December 25, the [petitioner] spent Christmas with his family. That night, he went to Edgewater and dropped off some of the firearms and ammunition he planned to use. The [petitioner] did not want to walk in the next day and "scare everyone off and cause a panic by carrying in firearms."

On December 26, the [petitioner] went to work. He loaded a large, black duffel bag with ammunition and a .32 caliber automatic handgun, and put the bag in his office cabinet. He took some Percocets and Darvocets, together with some vodka. He spoke to several employees. Over the telephone, he also spoke to a person about the payments on his automobile, and to his mother.

The [petitioner], armed, then walked to the reception area and announced that he was "looking for HR," which was the "triggering phrase" that would transport him back in time. A portal opened in front of him and he was transported to a bunker in Berlin in the year 1940 with his AK-47 assault rifle and his shotgun. There were two men wearing swastika arm bands, whom he shot with the AK-47, and then he shot three men with armbands who were on a raised platform. The [petitioner] testified that he could then "feel Hitler's thoughts emanating" from a room, so he blew

_____

[7] At this point the following footnote appears in the opinion: "The defendant felt that Troy and Bohrer were "no better than Nazis" because they just chose to follow orders."

[8] At this point the following footnote appears in the opinion: "The defendant admitted that he did not have a license to carry his firearms, and that he had stockpiled them more than a decade before the shootings."

the lock out of the door to the room, went inside, shot and killed "the last Nazi" who was hiding there, and then shot and killed Hitler. The [petitioner] had completed God's plan; he returned to the reception area and sat down. He was later dragged off by guards to a police station in Berlin, where he died. The [petitioner] testified that he currently is in purgatory and that nothing around him exists.

Two mental health professionals, Dr. Ann Schwab, a psychologist, and Dr. Alan D. Rothstein, a psychiatrist, both of whom had treated the [petitioner] prior to December 26, 2000, testified for the defense. Schwab first met with the [petitioner] in Maine in June, 1987, and last saw the [petitioner] in April, 1988. She diagnosed the [petitioner] as having a depressive mood disorder and an obsessive-compulsive personality disorder. The [petitioner] disclosed the sexual abuse that he suffered as a child. He reported feelings of loneliness, troubles at work, having heard noises from a television when the sound was off, and sensitivity to high frequency noises. The [petitioner] remarked that "you learn not to talk about [the noises] because people think you are crazy."

In 1996, the [petitioner] started seeing Dr. Rothstein, who diagnosed him as having recurrent major depression, a mixed character disorder, and an obsessive-compulsive personality. This diagnosis remained the same through December, 2000. In 1999 and 2000, Dr. Rothstein prescribed the [petitioner] Prozac and Trazodone. At a therapy session on March 7, 2000, the [petitioner] reported that he had started working at Edgewater and that it was a "terrific place." The [petitioner] acknowledged that he was still having problems with overeating and not eating healthy foods, and with credit cards. He also told Dr. Rothstein that he possessed guns.[9] During a session in September, 2000, the [petitioner] stated that he had been depressed the past two months, had stopped going to the gym, and was upset

_____

[9] At this point the following footnote appears in the opinion: "Dr. Rothstein told the defendant that, in light of his depression and suicidal feelings, he should not possess weapons. The defendant replied that he had a legal right to have weapons and that 'if anyone tells me I have to get rid of them, I'll just stop having contact with that person.'"

because the IRS claimed he owed it money.

On November 7, 2000, the [petitioner] reported that his condition had improved. On December 14, the [petitioner] telephoned Dr. Rothstein, and told him that the IRS was going to garnish his wages and leave him too little money to live on. The [petitioner] was upset. Dr. Rothstein suggested that the [petitioner] come in prior to their next scheduled appointment of December 26. The [petitioner] reported back on December 18 that his supervisor was trying to talk to the IRS on his behalf. Dr. Rothstein again offered the [petitioner] a sooner appointment, and the [petitioner] said he would contact him if necessary. Dr. Rothstein never heard from the [petitioner] again.

Following his arrest, the [petitioner] was evaluated by psychologist Ronald S. Ebert[10] and psychiatrist Anthony Joseph. Based on his review of records and interviews with the [petitioner], Dr. Ebert concluded that the [petitioner] suffered from schizophrenia of the paranoid type. Based on his review of records and interviews with the [petitioner] and others, Dr. Joseph concluded that the [petitioner] suffered from a schizoaffective disorder of the depressed subtype. Both Dr. Ebert and Dr. Joseph expressed the opinion that, at the time of the killings, the [petitioner] was suffering from a mental disease that deprived him of the

---

[10]  At this point the following footnote appears in the opinion: "Psychologist Ronald S. Ebert had another psychologist, Anthony Kalinowski, administer the Minnesota Multiphasic Personality Inventory (MMPI) test to the defendant in November, 2001. The test results indicated that the defendant is a schizotypal person, namely a person who is socially disconnected and who has odd and unusual thoughts and perceptual experiences. Dr. Kalinowski testified that people with this disorder are prone to becoming psychotic with some regularity. Test results also revealed that the defendant is inflexible, rigid, righteous, resentful, chronically angry, depressed, unpredictable, and "the kind of person who would walk along with his anger under pretty good control and then explode." Dr. Kalinowski compared the 2001 test results to the test results of a MMPI test taken by the defendant in 1982. While there were variances in the results, the defendant's profile essentially remained the same. Noteworthy, however, was a "jump" in one "scale" that indicated that the defendant either was malingering or had become more sick. Dr. Kalinowski rejected the prospect of malingering, but acknowledged there certainly was a risk of it.

substantial capacity to appreciate the wrongfulness or the criminality of his conduct and interfered with his ability to conform his conduct to the requirements of the law. Neither believed that the [petitioner] was malingering.

In rebuttal, the Commonwealth questioned Mohammad Hassar, a software developer at Edgewater who had worked with the [petitioner]. While at work on December 22, 2000, Hassar explained to the [petitioner] that he was fasting for the religious holiday Ramadan. The [petitioner] told Hassar that he did not believe in God, but rather believed in science.

The Commonwealth also presented two expert witnesses, psychiatrists Dr. Michael Annunziata and Dr. Malcolm P. Rogers, both of whom testified that, based on their respective reviews of various records and interviews with the [petitioner] and others, the [petitioner] was criminally responsible when he committed the killings and was feigning mental illness. In reaching his opinion, Dr. Annunziata considered the [petitioner] ingestion of pills as a teenager, his self-inflicted superficial scratches on his wrist after he was fired from Maine Yankee, and his "insignificant overdose" of pills in 1990 that did not require hospitalization and that occurred after he ran out of tuition money. Dr. Annunziata testified that the circumstances of these acts showed they were mere gestures and not real suicide attempts. Dr. Annunziata acknowledged that the [petitioner] has not had "a happy life in many respects" and has a depressive disorder and a personality disorder, but explained that these disorders did not amount to a mental disease or defect.

Dr. Annunziata stated that there were no indicators that the [petitioner] had a schizophrenic disorder. He explained that schizophrenia is a longitudinal disorder, not a disorder that abruptly appears. He also explained that delusions, especially of the elaborate and dramatic type such as the [petitioner] claimed occurred to him on December 14, 2000, do not appear abruptly in a person like the [petitioner], who has no prior history of psychosis. The [petitioner] exhibited no dysfunction in the weeks, days, hours, or minutes before the shootings. His work performance at Edgewater remained strong. On the morning of December 26, the [petitioner] was able to carry on in the usual course, speaking with his coworkers, the representative who indicated his automobile would be

repossessed, and his mother.  The archangel's prediction of
an eclipse, part of the [petitioner's] delusion, was an
entirely predictable event that did, in fact, occur on
Christmas day that year.  That a delusion would unfold into
reality was coincidental to the extreme.  Further, the
[petitioner's] statement on December 22, to Hassar that he
(the [petitioner]) did not believe in God was inconsistent
with the [petitioner's] purported religious delusion that
took place on December 14 and his compulsion to carry out
God's plan as relayed by the archangel.

 Dr. Rogers also concluded that the [petitioner] had
problems with depression and a personality disorder, none of
which constituted a mental disease or defect.  He expressed
the opinion that the [petitioner] did not have a psychosis
at the time of the shootings.  Dr. Rogers indicated that the
[petitioner] appreciated the wrongfulness of his conduct
based on his decision to test-fire his weapons in a secluded
area, and his decision to sneak weapons into Edgewater on
Christmas day when his coworkers would not be present.  Dr.
Rogers's conclusion that the [petitioner] possessed the
substantial capacity to conform his conduct to the
requirements of the law was based, in part, on the
[petitioner]'s ability to function and act in his usual
fashion during the time preceding the shootings, and his
presence of mind when the police entered Edgewater "to hold
still and not move and to keep his hands where they were
visible" so that he would not be shot or hurt.  Dr. Rogers
believed that the [petitioner] was faking an insanity
defense because many of the [petitioner's] reported symptoms
"did not fit [his] observable behavior."  Dr. Rogers based
this conclusion on several factors: there was no evidence of
psychosis; a delusional belief system usually evolves
gradually and does not begin at a fixed moment in time;
after someone develops a delusional belief system or
hallucinations, there is a fluctuation in the severity of
those symptoms - they do not remain static, such as
maintaining, in the [petitioner's] case, an ongoing delusion
that he is in purgatory; and the [petitioner's] researched
specifically how to fake mental illness and how to malinger.

Commonwealth v. McDermott, 864 N.E.2d at 475-482.

DISCUSSION

I.  <u>Standard of Review</u>

The Antiterrorism and Effective Death Penalty Act, 28 U.S.C. § 2254 ("section 2254"), governs these proceedings because petitioner filed this petition after April 24, 1996.  Section 2254(d) establishes "two categories of cases in which a state prisoner may obtain federal habeas relief with respect to a claim adjudicated on the merits in state court."  <u>Williams v. Taylor</u>, 529 U.S. 362, 404 (2000).  Under the first category, "a state court determination is 'contrary to' clearly established law if the court 'applies a rule that contradicts the governing law set forth' by the Supreme Court or 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [its] precedent.'"  <u>Gomes v. Brady</u>, 564 F.3d 532, 537 (1st Cir. 2009); <u>accord</u> <u>Ramdass v. Angelone</u>, 530 U.S. 156, 165-166 (2000) (decision is contrary to "clearly established federal law if it applies a legal rule that contradicts" the "prior holdings" of the Supreme Court or "reaches a different result from" a Supreme Court case "despite confronting indistinguishable facts"); <u>Williams v. Taylor</u>, 529 U.S. at 405-406 (same).

Under the second category, the federal court may grant the writ if the relevant state court decision "'involved an unreasonable application of clearly established Federal law, as

16

determined by the Supreme Court of the United States.'" <u>Williams</u> <u>v. Taylor</u>, 529 U.S. at 404-405 (quoting statute with ellipses omitted).  An unreasonable application of clearly established federal law occurs if the state court "'correctly identifies the governing legal principles, but (i) applies those principles to the facts of the case in an objectively unreasonable manner; (ii) unreasonably extends clearly established legal principles to a new context where they should not apply; or (iii) unreasonably refuses to extend established principles to a new context where they should apply.'"  <u>Gomes v. Brady</u>, 564 F.3d at 537; <u>see</u> <u>Foxworth v. St. Amand</u>, 570 F.3d 414, 425 (1st Cir. 2009).

"'[C]learly established Federal law'" refers to "'the holdings, as opposed to the dicta, of the Supreme Court's decisions at the time of the relevant state court decision.'" <u>Yeboah-Sefah v. Ficco</u>, 556 F.3d 53, 65 (1st Cir.), <u>cert.</u> <u>denied</u>, 130 S.Ct. 639 (2009).  The inquiry is an objective one, <u>see</u> <u>McCambridge v. Hall</u>, 303 F.3d 24, 36 (1st Cir. 2002), insofar as the decision "must have been 'objectively unreasonable.'" <u>Wiggins v. Smith</u>, 539 U.S. 510, 520 (2003).

An objectively unreasonable application of the relevant jurisprudence differs from an incorrect or erroneous application of such jurisprudence.  <u>Williams v. Taylor</u>, 529 U.S. at 365; <u>accord</u> <u>Wiggins v. Smith</u>, 539 U.S. at 520-521 ("state court's decision must have been more than incorrect or erroneous").

17

Under the unreasonable application prong, the "habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams v. Taylor, 529 U.S. at 365; accord Schriro v. Landrigan, 550 U.S. 465, 473 (2007) ("question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable--a substantially higher threshold"). When "it is the state court's application of governing federal law that is challenged, the decision 'must be shown to be not only erroneous, but objectively unreasonable.'" Waddington v. Sarausad, 129 S.Ct. 823, 831 (2009); accord Foxworth v. St. Amand, 570 F.3d at 425 ("state court's decision is not vulnerable unless it evinces some increment of incorrectness beyond mere error"). With these principles in mind, this court turns to the grounds for habeas relief.

## II. Ground One

Ground 1(a) (Docket Entry # 1, ¶ 12A) as elucidated in petitioner's original memorandum (Docket Entry # 2, pp. 10-15) raises an ineffective assistance of trial counsel claim because counsel did not investigate or present evidence that petitioner's conduct resulted from a drug induced state of auditory and visual

hallucinations caused by his ingestion of a prescribed medication, Prozac ("Prozac defense").  Ground 1(b) (Docket Entry # 1, ¶ 12A) as elucidated in the memorandum (Docket Entry # 2, pp. 15-16) alleges trial counsel's ineffectiveness because he failed to request a jury instruction on involuntary intoxication.

An ineffective assistance of counsel claim is "a mixed question of law and fact and should therefore be reviewed under the 'unreasonable application' clause of section 2254(d)." Shuman v. Spencer, 636 F.3d 24, 31 (1st Cir. 2011) (quoting Yeboah-Sefah, 556 F.3d at 70).  The SJC rejected the ineffective assistance of trial counsel claim under the statutory standard of section 33E applicable to appeals of first degree murder convictions.  That standard is "more favorable to the defendant than the federal constitutional standard articulated by the Supreme Court in Strickland."  Knight v. Spencer, 447 F.3d 6, 10 (1st Cir. 2006); Commonwealth v. Wright, 584 N.E.2d 621, 624 (Mass. 1992), ("statutory standard of § 33E is more favorable to a defendant than is the constitutional standard for determining the ineffectiveness of counsel"); see generally Commonwealth v. Mello, 649 N.E.2d 1106, 1118 & n.16 (Mass. 1995) (noting that if state ineffective counsel standard is met then federal standard is met).  Accordingly, this court "presume[s] the federal law adjudication [of the SJC] to be subsumed within the state law

adjudication" and therefore "'adjudicated on the merits' within the meaning of § 2254." <u>McCambridge v. Hall</u>, 303 F.3d at 35.

The "more favorable 'substantial likelihood of a miscarriage of justice' standard" is not "'contrary to' the <u>Strickland</u> criterion." <u>Knight v. Spencer</u>, 447 F.3d at 16. This court therefore turns to the unreasonable application prong of section 2254(d) review.

The Supreme Court "recently reinforced the 'doubly' deferential standard that applies to a state prisoner's claims in a federal habeas petition that a state court has unreasonably applied the <u>Strickland</u> principles." <u>Jewett v. Brady</u>, 634 F.3d 67, 75 (1ˢᵗ Cir. 2011) (quoting <u>Harrington v. Richter</u>, 131 S.Ct. 770, 788 (2011)). Under <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), the petitioner has the burden to show by a preponderance of the evidence that: "(1) counsel's performance fell below an objective standard of reasonableness, and (2) there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different." <u>Smullen v. United States</u>, 94 F.3d 20, 23 (1ˢᵗ Cir. 1996); <u>accord</u> <u>Gonzalez-Soberal v. United States</u>, 244 F.3d 273, 277 (1ˢᵗ Cir. 2001) (same).

Under the first prong, the petitioner must show that "'counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.'" <u>Smullen v. United States</u>, 94 F.3d at 23 (quoting

Strickland v. Washington, 466 U.S. at 687).  Under Strickland there is also "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"  Id. at 689.  Consequently, the ineffective assistance prong is satisfied "only where, given the facts known at the time, counsel's 'choice was so patently unreasonable that no competent attorney would have made it.'"  Knight v. Spencer, 447 F.3d at 15.

As to a failure to investigate, "trial counsel 'has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.'"  Janosky v. St. Amand, 594 F.3d 39, 49 (1st Cir. 2010) (quoting Strickland, 466 U.S. at 691).  The proper focus in assessing a decision not to investigate is "reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."  Id.  "Beyond the general requirement of reasonableness, 'specific guidelines are not appropriate'" and "Strickland itself rejected the notion that the same investigation will be required in every case."  Cullen v. Pinholster, 131 S.Ct. 1388, 1407 (2011).

The second Strickland prong requires a showing that "counsel's errors prejudiced the defense."  Gonzalez-Soberal v.

21

_United States_, 244 F.3d 273, 277 (1ˢᵗ Cir. 2001).  The proper

focus is on "the 'fundamental fairness of the proceeding.'"  _Id._

at 278; _accord_ _Lockhart v. Fretwell_, 506 U.S. 364, 372 (1993)

(prejudice prong focuses on "whether counsel's deficient

performance renders the result of the trial unreliable or the

proceeding fundamentally unfair").  A "reasonable probability" is

therefore "a probability sufficient to undermine confidence in

the outcome."  _Knight v. Spencer_, 447 F.3d at 15 (internal

quotation marks omitted).  The petitioner must show "that

counsel's errors were so serious as to deprive the [petitioner]

of a fair trial, a trial whose result is reliable."  _Strickland_

_v. Washington_, 466 U.S. at 687; _see_ _also_ _Lockhart v. Fretwell_,

506 U.S. at 372 ("[u]nreliability or unfairness does not result

if the ineffectiveness of counsel does not deprive the defendant

of any substantive or procedural right to which the law entitled

him").

A. Failure to Investigate

     As to ground 1(a), petitioner asserts that trial counsel was

ineffective for failing to fully investigate or present

exculpatory evidence of an established link between Prozac and

auditory and visual hallucinations of a psychotic nature.  Where,

as here, the state courts never addressed the federal claims,

"federal review is de novo."  _Pike v. Guarino_, 492 F.3d 61, 67

(1ˢᵗ Cir. 2007); _accord_ _Lynch v. Ficco_, 438 F.3d 35, 44 (1ˢᵗ Cir.

2006) (de novo review applies to federal claim that was "raised before the state court but was left unresolved") (internal quotation marks omitted); Fortini v. Murphy, 257 F.3d 39, 47 (1st Cir. 2001).

In support of this claim, petitioner cites to case law outside the First Circuit where an attorney's failure to investigate and present available exculpatory evidence constituted deficient performance under Strickland. See Grooms v. Solem, 923 F.2d 88, 90 (8th Cir. 1991) ("it is unreasonable not to make some effort to contact [alibi witnesses] to ascertain whether their testimony would aid the defense"); Lawrence v. Armontrout, 900 F.2d 127, 130 (8th Cir. 1990) (failure to interview alibi witnesses was deficient performance under first Strickland factor); Harris v. Reed, 894 F.2d 871, 878 (7th Cir. 1990) (failure to call witness to contradict eyewitness identification of the defendant was ineffective assistance). Petitioner reads these cases for the proposition that "an attorney's failure to present available exculpatory evidence is ordinarily deficient, 'unless some cogent tactical or other consideration justified it.'" Griffin v. Warden, 970 F.2d 1355, 1358 (4th Cir. 1992) (quoting Washington v. Murray, 952 F.2d 1472, 1476 (4th Cir. 1991).

This case is factually distinguishable because trial counsel was aware of the Prozac defense and had legitimate tactical

reasons for declining to present it as petitioner's primary defense. On direct examination, trial counsel questioned defense expert Anthony Joseph, M.D. ("Dr. Joseph") about the Prozac defense. Dr. Joseph was aware of the defense but was not willing to testify to a reasonable degree of medical certainty that Prozac caused petitioner's hallucinations or caused him to commit the killings. (Docket Entry # 17, S.A. Vol. III, pp. 270-273 & 275-278). Rather, Dr. Joseph offered the opinion that "it's very possible that the Prozac is the final piece in the puzzle that would explain the level of rage and anger that allowed the killings to occur." (Docket Entry # 17, S.A. Vol. III, pp. 275-278).

Contrary to petitioner's assertion, trial counsel pursued to a significant extent the link between anti-depressants and the possible resultant effects including those of a psychotic nature. Petitioner's own defense expert, however, would not testify within a reasonable degree of medical certainy in support of a pure Prozac defense. As such, it was not unreasonable for trial counsel to abandon this defense and to present an insanity defense with Prozac forming a "piece of the puzzle." (Docket Entry # 17, S.A. Vol. III, Tab 1 p. 278); see Commonwealth v. Shuman, 836 N.E.2d 1085, 1092-93 (rejecting claim that defense counsel was ineffective for presenting insanity defense rather than pure "Zoloft defense"). Reviewing the entire record, trial

counsel presented a vigorous and thorough insanity defense which included Prozac as part albeit not all of the defense. See, e.g., id. at 1092 (rejecting "Zoloft defense" and finding that counsel presented a "vigorous, well-prepared, and well-presented insanity defense, with substantial expert and medical testimony to support it"). In short, trial counsel conducted a reasonable investigation of the Prozac defense and made a reasonable decision not to rely exclusively on it in light of the inability of his expert to render an opinion to a reasonable degree of medical certainty.

The Sixth Amendment "has never required defense counsel to pursue every claim or defense, regardless of its merit, viability, or realistic chance for success." Knowles v. Mirzayance, 129 S.Ct. 1411, 1420 (2009) (holding that counsel was not ineffective for withdrawing insanity plea in second phase of bifurcated trial, where jury rejected expert evidence of insanity in guilt phase of the trial); see also Shuman v. Spencer, 657 F.Supp.2d 268, 276 (D.Mass. 2009) ("[t]rial counsel's inability to predict or investigate a potentially more effective variation of a well-prepared insanity defense does not constitute ineffectiveness of counsel"). In other words, "the law does not require counsel to raise every available nonfrivolous defense." Knowles v. Mirzayance, 129 S.Ct. at 1422 (citing Jones v. Barnes, 463 U.S. 745, 751 (1983) and Wiggins v. Smith, 539 U.S. at 533).

Here, because petitioner failed to show that trial counsel's ultimate choice of strategy was manifestly unreasonable, the state court's denial of his ineffective assistance claim was not an unreasonable application of <u>Strickland</u>.  <u>See</u> <u>Knowles</u>, 129 S.Ct. at 1422.  Ground 1(a) does not provide habeas relief.

B.  <u>Failure to Request Jury Instructions</u>

As to ground 1(b), petitioner asserts that trial counsel was ineffective for failing to request a jury instruction on involuntary intoxication.  This claim is without merit.  On direct appeal, the SJC determined that as a matter of state law, petitioner's evidence "did not warrant such an instruction because there was no evidence that [petitioner] was 'compelled to ingest intoxicants unwillingly' or that he suffered 'intoxicating effects from prescription medication used as instructed.'" <u>McDermott</u>, 864 N.E.2d at 493 (quoting <u>Commonwealth v. Darch</u>, 767 N.E.2d 1096 (Mass.App.Ct. 2002)).  In fact, the evidence showed that "[petitioner] increased his dose of Prozac without the prescribing physician's permission or advice."  <u>McDermott</u>, 864 N.E.2d at 493.

"[I]t is not the province of a federal habeas court to re-examine state-court determinations on state-law questions." <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68 (1991).  Moreover, petitioner does not challenge the underlying factual determination that petitioner voluntarily increased his dose of

Prozac without his doctor's permission or advice.  See 28 U.S.C.
§ 2254(e)(1) (determination of a factual issue made by a State
court presumed correct and petitioner has burden of rebutting the
presumption by clear and convincing evidence).  Because the
evidence did not entitle petitioner to an involuntary
intoxication instruction under state law, trial counsel was not
unreasonable or ineffective for not requesting such an
instruction.  See Vieux v. Pepe, 184 F.3d 59, 64 (1st Cir. 1999)
("[o]bviously, counsel's performance was not deficient if he
declined to pursue a futile tactic").

III. Ground Two

Ground two (Docket Entry # 1, ¶ 12B), as elucidated in
petitioner's reply to respondent's memorandum (Docket Entry # 19,
pp. 16-18), raises a due process claim under the Fifth, Sixth and
Fourteenth Amendments because the state court denied petitioner
funds to obtain an expert psychiatrist, Joseph Glenmullen, M.D.,
to support petitioner's motion for a new trial.  Petitioner
requested funds from the trial court "to further support his
motion with the retention of an expert . . . to fully investigate
and support this defense, something which state and federal due
process require."  (Docket Entry # 17, S.A. p. 292).  At issue is
whether the entitlement to costs to retain an expert extends to a
post-conviction proceeding for a new trial motion.

"Due process requires that, where 'the defendant's mental condition [is] relevant to his criminal culpability and to the punishment he might suffer,' the government provide to indigent defendants expert psychiatric testimony at 'the sentencing phase.'" United States v. Mastera, 435 F.3d 56, 62-63 (quoting Ake v. Oklahoma, 470 U.S. 68, 83-84 (1985)).  The court went on to state that this does not give the defendant "a constitutional right to choose a psychiatrist of his personal liking or to receive funds to hire his own," but that there "is access to a competent psychiatrist for the [above stated purposes], and [the court leaves] to the States the decision on how to implement this right."  Ake, 470 U.S. at 83.

The reasoning behind the Ake decision drew life from other due process decisions entitling the defendant to access the trial transcript if the transcript is necessary to a decision on the merits of the appeal, see Griffin v. Illinois, 351 U.S. 12 (1956), providing that the defendant not be required to pay a fee before filing a notice of appeal of his conviction, see Burns v. Ohio, 360 U.S. 252 (1959), and entitling the defendant to effective assistance of counsel at trial and on his first direct appeal as of right.  See Gideon v. Wainwright, 372 U.S. 335 (1963); Douglas v. Clifornia, 372 U.S. 353 (1963); and Strickland, 466 U.S. 668.  These cases afford defendants "meaningful access to justice," and this requires the State to

make certain the defendant "has access to the raw materials integral to the building of an effective defense." Ake, 470 U.S. at 77. Materials for meaningful access do not rise to "all the assistance that [a] wealthier counterpart might buy." Id. (citing Ross v. Moffitt, 417 U.S. 600 (1974)). Rather, the scope of meaningful access is limited to the "basic tools of an adequate defense or appeal." Britt v. North Carolina, 404 U.S. 226, 227 (1971).

The right to a competent psychiatrist at trial qualifies as one of the "basic tools" for an insanity defense. Id. No Supreme Court case, however, has extended this right to state post-conviction proceedings. Under Strickland and 28 U.S.C. § 2254(d)(1), "it is not 'an unreasonable application of clearly established Federal law" for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme Court]." Knowles v. Mirzayance, 129 S.Ct. 1411, 1413 (2009) (citing Wright v. Van Patten, 552 U.S. 120 (2009)). Because the Supreme Court's cases "give no clear answer to the question presented, let alone one in [petitioner's] favor, 'it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" Wright v. Van Patten, 552 U.S. at 126 (quoting Carey v. Musladin, 549 U.S. 70, 77 (2006)). In any event, no new rule extending Ake to the post-conviction setting could be applied for the first time on habeas review. See

29

<u>Kater v. Maloney</u>, 459 F.3d 56, 63 (1st Cir. 2006) (citing <u>Teaque</u> <u>v. Lane</u>, 489 U.S. 288, 310 (1989)).  The claim therefore fails because there is no established due process right to funds to retain a psychiatric expert in a state post-conviction proceeding.

<u>CONCLUSION</u>

In accordance with the foregoing discussion, this court **RECOMMENDS**[11] that the petition for writ of habeas corpus (Docket Entry # 1) be **DENIED.**

/s/ Marianne B. Bowler
**MARIANNE B. BOWLER**
United States Magistrate Judge

_____

---

[11]  Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days of receipt of the Report and Recommendation to which objection is made and the basis for such objection.  <u>See</u> Rule 72(b), Fed. R. Civ. P.  Any party may respond to another party's objections within 14 days after service of the objections.  Failure to file objections within the specified time waives the right to appeal the order.